**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

ANTHONY M.,[1]

       **Plaintiff,**

v.                             **Civil Action No. 4:22-cv-116**

KILOLO KIJAKAZI,
*Acting Commissioner of*
*Social Security,*

       **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff Anthony M. seeks judicial review of the Commissioner of Social Security's denial of his claim for disability benefits ("DIB") under the Social Security Act ("the Act"). Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") improperly evaluated medical opinion evidence from Plaintiff's psychological treating provider. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. This Report concludes the ALJ adequately considered the medical opinion evidence in the record, and

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

therefore recommends that the court deny Plaintiff's motion for summary judgment and affirm the final decision of the Commissioner.

## I.   PROCEDURAL BACKGROUND

Plaintiff protectively filed for DIB under Title II of the Act on March 9, 2021. (R. 71, 241-44). He alleged disability beginning December 31, 2018, based on high blood pressure, an enlarged heart, numbness in his hands and feet, and right arm pain. (R. 241, 266). The state agency denied his application initially and on reconsideration. (R. 71-81, 82-92). Plaintiff then requested an administrative hearing. (R. 113-14). The hearing was held on July 25, 2022. (R. 37-70). Counsel represented Plaintiff at the hearing, and an impartial vocational expert ("VE") testified. Id. On August 8, 2022, the ALJ denied Plaintiff's claim for DIB, finding he was not disabled during the period alleged. (R. 17-32). The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 20-22). The ALJ also found that Plaintiff's RFC permitted him to perform work within the national economy. (R. 30-31). On September 13, 2022, the Appeals Council denied Plaintiff's request for review. (R. 3-8).

On November 2, 2022, Plaintiff filed his complaint in this court. Compl. (ECF No. 1). He seeks judicial review of the Commissioner's final decision that he was not disabled, claiming

that "[t]he agency committed error of law by denying Appeals Council review" and that "[t]he conclusions and findings of fact of the [Commissioner] are not supported by substantial evidence and are contrary to law and regulation." Id. ¶¶ 4, 8 (ECF No. 1, at 2). On March 8, 2023, Plaintiff moved for summary judgment. (ECF No. 15).

Plaintiff argues that the case should be reversed or remanded because the ALJ "failed to properly evaluate the opinion evidence" from Plaintiff's psychotherapist, Stephanie J. Eppinger, Ph.D. Pl.'s Mem. Supp. Soc. Security Appeal ("Pl.'s Mem.") (ECF No. 17, at 5-11). On April 7, 2023, the Commissioner opposed Plaintiff's motion.[2] (ECF No. 19). The Commissioner argues that the ALJ "reasonably found Dr. Eppinger's checkbox form only somewhat persuasive." Def.'s Br. Supp. Decision Denying Disability Benefits ("Def.'s Br.") (ECF No. 19, at 23). After a review of the record, this Report considers each of these arguments.

---

[2] In opposing Plaintiff's motion, the Commissioner did not move for summary judgment. However, under the new Supplemental Rules for Social Security Actions, effective December 1, 2022, appeals from final decisions of the Social Security Administration are presented for decision by the parties' briefs. Supp. R. Soc. Security Actions Under 42 U.S.C. § 405(g), Rule 5. As both parties have filed their briefs on this matter pursuant to the undersigned's Briefing Order, (ECF No. 12), this matter is ripe for review notwithstanding the absence of cross-motions for summary judgment. To the extent the Commissioner's brief, (ECF No. 19), seeks summary judgment in the Commissioner's favor, the undersigned recommends that the court GRANT the motion.

## II.  FACTUAL BACKGROUND

Plaintiff was born on January 27, 1986, and at the time of the ALJ's decision, he was 36 years old.  (R. 30).  He meets the insured status requirements under the Act until March 31, 2025.  (R. 19).  He has not engaged in substantial gainful activity since December 31, 2018, the alleged onset date.  Id.  He completed some college and reported past work as a toll collector and cable installer.  (R. 45-47, 267).

### A.  Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of his medical history, as he disputes only the ALJ's assessment of certain medical opinions.  The treatment Plaintiff received, as relevant to the instant motion, is outlined below.

#### 1.  Hampton VA Medical Center

During the alleged period of disability, Plaintiff primarily treated with mental health providers at the Hampton VA Medical Center.  In particular, he frequently treated with Stephanie Eppinger, Ph.D., and Sarah Semones, APRN-BC.  Dr. Eppinger was Plaintiff's primary psychotherapist, while Semones provided medication management treatment and psychotherapy support services.

On January 17, 2019, Plaintiff presented to Semones for a follow-up appointment and told her "things ha[d] been hectic."  (R. 672).  He said he and his mother had been evicted, his credit

4

cards were maxed out, he was working two jobs, and he was not sleeping. Id. Plaintiff reported symptoms of depression, anxiety, and suicidal ideation, but denied suicidal planning, paranoia, phobias, or hallucinations. Id. Semones diagnosed Plaintiff with major depressive disorder. (R. 674). She also conducted a mental status examination and found that Plaintiff's mood and affect were anxious, but his thought processes were logical and his thought content normal. (R. 672). He was alert and oriented, pleasant, maintaining eye contact, and speaking normally. Id.

Plaintiff presented to Dr. Eppinger twice in February 2019 for individual psychotherapy sessions. (R. 668-70). He told her he had moved into a new apartment with his mother and was in school[3] but was having difficulty attending classes and was unsure how he was performing. (R. 669-70). He described several conflicts with his mother, explaining that she had asked for money beyond his share of living expenses, used his car, and incurred debt by renting an apartment and applying for a car loan in his name. Id. At his first session that month, Plaintiff reported increased depression, and although it had improved by his second session, he also was having trouble sleeping. (R. 668-70). Dr. Eppinger diagnosed him with chronic PTSD. (R. 669-70). Throughout both

---

[3] At this time, Plaintiff was enrolled in a radiology program at Tidewater Community College ("TCC"). (R. 656, 663).

sessions, Plaintiff was alert and oriented, speaking normally, thinking logically, and maintaining socially appropriate eye contact. Id. He denied suicidal ideation. Id.

Plaintiff met with Dr. Eppinger for another psychotherapy session on March 6, 2019. (R. 663). He reported stress and lack of sleep due to working overnight shifts and taking a full load of classes during the day. Id. He also expressed frustration regarding his slipping grades and perceived unfairness at work due to favoritism. Id. Dr. Eppinger again noted Plaintiff's chronic PTSD diagnosis. Id. As at his previous sessions, Plaintiff denied suicidal ideation and was alert and oriented, speaking normally, thinking logically, and maintaining socially appropriate eye contact throughout the session. Id.

On April 1, 2019, Plaintiff saw Dr. Eppinger again. (R. 658-59). Plaintiff reported that he quit his job and was looking into an alternative radiology program at ECPI University ("ECPI") because TCC had withdrawn his financial aid, making classes too financially burdensome to continue. (R. 659). He explained that he felt stressed when driving and often became rageful towards other drivers, but when Dr. Eppinger questioned these feelings, she noted that Plaintiff "had difficulty seeing beyond his own rationalization for his behavior." Id. She again diagnosed him with chronic PTSD. Id. As at his previous sessions, Plaintiff denied suicidal ideation and was alert and oriented, speaking

normally, thinking logically, and maintaining socially appropriate eye contact throughout the session.  Id.

Nine days later, on April 10, 2019, Plaintiff had another follow-up appointment with Semones.  (R. 648-53).  He claimed to be compliant with his medicine regime but was still struggling with agitation while driving.  (R. 648-49).  He also expressed frustration with his class, claiming he would "forget everything" when taking tests.  Id.  He endorsed symptoms of depression and anxiety.  (R. 649).  Semones diagnosed Plaintiff with depression and PTSD.  (R. 650).  On mental examination, she noted that Plaintiff maintained good eye contact, was alert and oriented, spoke normally, appeared euthymic, was thinking logically, and denied suicidal ideations or hallucinations.  (R. 649).

This general pattern of treatment continued for approximately the next seven months, through the end of November 2019.  Over this period, Plaintiff would meet with Dr. Eppinger or Semones and report road rage and depression due to various life stressors, including financial struggles, uncertainty over his career path and schooling, conflict with mother, and legal issues.  (R. 608-09, 612-16, 618-19, 635-36, 644-46).  For example, he told Dr. Eppinger he was wary of pursuing a radiology degree at ECPI, but ultimately decided to enroll in approximately May 2019.  See (R. 635-36, 644-46).

Additionally, in May 2019, he reported that he lashed out at his partner because he was feeling overwhelmed, and that he carried a knife in his car to flash at other drivers when frustrated. (R. 636). In July 2019, Dr. Eppinger diagnosed Plaintiff with an unspecified depressive disorder, (R. 619), and in August 2019, Plaintiff told Semones that his medicine helped with his stress, (R. 612). Over this roughly seven-month period, Dr. Eppinger continually noted Plaintiff's chronic PTSD diagnosis, and Plaintiff's mental examination findings were consistently unremarkable. (R. 608, 612-13, 619, 636, 644, 646). Semones also diagnosed Plaintiff with anxiety disorder. (R. 613).

On December 6, 2019, Plaintiff called the Hampton VA Medical Center and spoke with Monique Robinson. (R. 567-68). He said he failed an important course and complained of his professors' bias towards other students. Id. He also expressed dismay over losing his financial aid from ECPI, which was his only source of income. (R. 568). Plaintiff admitted having suicidal thoughts and was transferred to a suicide hotline. Id. Through the hotline, Plaintiff spoke with Valerie Davis. (R. 565). He told Davis that, although he was experiencing suicidal thoughts, he had no present plan or intent to end his life. (R. 566). He also disclosed struggling with suicidal ideation in the past and having attempted suicide twice, once four years ago and once as a teenager. Id.

Two days later, suicide prevention case manager Jenny Meyer followed up with Plaintiff by phone.  _Id._  Plaintiff denied suicidal ideations, planning, or intent, but again "verbalized feeling down because he was withdrawn from the 'RAD tech' program at school."  _Id._

Two days after his follow up call with Meyer, Plaintiff met with Semones and told her "he was very upset last week after being withdrawn from his academic program after failing a class."  (R. 560-65).  He explained that he "was feeling really stressed" and "was overwhelmed," but had only been partially compliant with his medication regime.  (R. 563).  He had decided to enroll in classes at TCC so he could receive aid to pay his rent.  _Id._  On mental examination, Semones noted that Plaintiff maintained good eye contact, was alert and oriented, spoke normally, appeared euthymic, was thinking logically, and denied suicidal ideations or hallucinations.  _Id._

On December 16, 2019, Plaintiff met with Dr. Eppinger for another psychotherapy session.  (R. 554-59).  He reported struggling with depression the past 10 days since being withdrawn from the ECPI radiology program. (R. 554).  He also admitted suicidal ideation, but was otherwise alert and oriented, speaking normally, thinking logically, and maintaining socially appropriate eye contact throughout the session.  _Id._  Dr. Eppinger conducted a suicide risk evaluation and recorded that Plaintiff had

9

experienced suicidal thoughts approximately every other day for the past two weeks. (R. 555). She also noted that, at the time of his most recent suicidal ideations, Plaintiff had also experienced suicidal intent and developed a suicide plan. Id. She assessed Plaintiff's various risk factors, including his previous suicide attempts, against his reasons for living, ultimately concluding that Plaintiff's acute suicide risk and chronic suicide risk were both "intermediate." (R. 555-56).

Over his next several appointments, Plaintiff exhibited a general pattern of improvement, followed by relapse, with regard to his suicidal ideations. For example, on December 24, 2019, Plaintiff told Dr. Eppinger that his suicidal thoughts had decreased, although he had another incident of road rage. (R. 553). He explained that he was managing his stress by working out and distracting himself. Id. Dr. Eppinger again noted Plaintiff's chronic PTSD and depressive disorder diagnoses, and found Plaintiff alert and oriented, speaking normally, thinking logically, and maintaining socially appropriate eye contact. Id.

Then, on January 24, 2020, Plaintiff met with Semones and told her it had "not been a good month." (R. 542). He admitted having suicidal ideations and said he had called the suicide hotline several times that month, which had been helpful. Id. He endorsed symptoms of depression and anxiety, as well as episodic homicidal ideations when feeling slighted, but explained that he

felt fine "in between" these episodes. <u>Id.</u> On mental examination, Semones found Plaintiff's mood labile, but otherwise found him functioning normally without suicidal intent or plans. <u>Id.</u> She diagnosed him with mood disorder and impulse control disorder. (R. 544).

On January 29, 2020, Plaintiff had another therapy session with Dr. Eppinger. (R. 538-39). He remained frustrated about his removal from the ECPI radiology program and was still taking classes at TCC in order to receive a financial aid stipend. (R. 539). He denied suicidal ideations, and Dr. Eppinger renewed her prior diagnoses and noted that Plaintiff appeared to be functioning normally on all spheres during the session. <u>Id.</u>

On February 21, 2020, Plaintiff told Semones that he was "not doing well" and that "yesterday was one of the worst days in a long time." (R. 533). He was having difficulty finding a job to help pay his bills. <u>Id.</u> He disclosed that he felt "like giving up," considered jumping off a bridge the previous night, and thought of harming persons who had denied him a job opportunity he desired. <u>Id.</u> At the same time, Plaintiff claimed to be in control of his behavior, but acknowledged "feeling like his options are limited." <u>Id.</u> On mental examination, Semones found Plaintiff alert and oriented, speaking normally, maintaining eye contact, and thinking logically, but noted that he presented in a sad, depressed mood and was suppressing tears. (R. 533). She also

renewed her PTSD and depression diagnoses from a prior visit. (R. 534). Plaintiff was assessed as a "moderate to high" suicide risk and advised to report to the hospital. (R. 533).

Plaintiff's struggles came to a head on February 28, 2020, when he presented at the emergency department of the Hampton VA Medical Center reporting suicidal intent with a plan to jump off a bridge and drown.[4] (R. 1259, 1262). He also reported "episodes where he feels so angry/irate that he wants to hurt those bothering him." (R. 1259). He was seen by Elionora Katz, M.D., Ph.D., who completed a suicide risk evaluation and concluded that Plaintiff's acute suicide risk was high. (R. 521-22, 1257-59). Plaintiff was admitted to an inpatient psychiatric ward with diagnoses of major depressive disorder and PTSD. See (R. 517, 526, 1229-30, 1243-44, 1252, 1261).

Plaintiff remained in the hospital for approximately five days. See (R. 1177). While there, Plaintiff participated in individual and group therapy sessions, took his medications, and was monitored daily. (R. 869, 986-87). Over several days time, "[h]is depressive [symptoms] lifted and he improved overall." Id. "He showed no signs of aggression . . . . [and] tolerated his medications." Id. Plaintiff ultimately left the hospital on March

---

[4] Plaintiff told a provider that, despite Semones having advised him to go to the hospital on February 21, 2020, he waited to report because he did not want to miss his classes. (R. 1223).

12

4, 2020, against his providers' medical advice.   (R. 869, 987, 1177).

Over the next two years, Plaintiff continued to meet with Dr. Eppinger and Semones.  His appointments began to follow the same pattern that had emerged prior to his bout with suicidal thoughts in late 2019 and early 2020; that is, he would arrive at his appointments reporting anger and/or depression due to school programs, work, finances, health, and family stresses, but exhibited largely normal mental functioning.  (R. 390-91, 398-400, 404-05, 437-38, 443-44, 462-63, 468-69, 474-75, 480-82, 500-02, 513, 1506-08, 1512-13, 1518-20, 1525, 1535-36, 1584-85, 1595-96, 1611-12, 1680-82, 1712-14, 1722-24, 1727-28, 1760-62).   His compliance with his medication regime was spotty.  Compare (R. 390, 404, 444, 502, 1507, 1714, 1761) with (R. 463, 474, 513, 1519, 1614).

Plaintiff did sporadically report suicidal ideations throughout the late summer and early fall of 2020.  For example, he called the suicide hotline again on July 6, 2020, reporting stress and suicidal thoughts after having a gun pulled on him while delivering food.  (R. 486).  However, he indicated that he was safe, and when a social worker followed up with him later that same day, he denied continued suicidal ideations.  (R. 486-87). Additionally, Plaintiff presented with "passive" suicidal thoughts

in July through September of 2020, (R. 469, 480, 482), but reported immediate improvement at his next appointments, (R. 463, 475, 481).

In October 2021, at Dr. Eppinger's suggestion, (R. 1585), Plaintiff also began attending group therapy sessions facilitated by clinical psychologist April Trotman, Ph.D., (R. 1778-81). The sessions, organized into a six-week course, focused on "mindfulness concepts" and "how to use mindfulness skills to orient to [the] present moment, increase self-kindness, and decrease emotional pain." (R. 1780). At the first session on October 22, 2022, Dr. Trotman noted that Plaintiff was alert and oriented, speaking appropriately, thinking normally, and engaged throughout the session. (R. 1780). Although Plaintiff's engagement fluctuated between sessions, Dr. Trotman noted normal mental functioning at each group meeting. (R. 1732-34, 1740-42, 1751-53, 1766-68, 1772-74). Dr. Trotman indicated that Plaintiff was progressing towards his goals and, by the end of the six-week course, had met his treatment objectives. (R. 1734, 1742, 1753, 1772, 1778).

B.   **Opinion Evidence**

1.   **State Agency Consultative Examiners**

a.   **Leslie Montgomery, Ph.D.**

On July 14, 2021, when Plaintiff's claim for DIB was pending at the initial level, state agency psychologist Leslie Montgomery, Ph.D., conducted a review of Plaintiff's medical records. (R. 75-

76, 78-79). She opined that Plaintiff had moderate limitations in interacting with others and concentrating, persisting, or maintaining pace, and a mild limitation in adapting or managing himself. (R. 75). Dr. Montgomery formed a mental RFC accounting for these limitations and found that Plaintiff "would be able to maintain concentration and attention for two hour periods in order to complete an eight hour day," and "maintain attendance and punctuality with only 1-2 problems per month." (R. 79). She also found that Plaintiff "could interact appropriately with supervisors and coworkers," but could interact with the public "only for brief periods or infrequently." Id. Given this mental RFC, Dr. Montgomery concluded that Plaintiff remained capable of performing simple, routine work tasks. Id.

  **b. Howard Leizer, Ph.D.**

  On October 6, 2021, when Plaintiff's claim for DIB was pending at the reconsideration level, state agency psychologist Howard Leizer, Ph.D., conducted a review of Plaintiff's medical records. (R. 86-87, 90-91). Dr. Leizer's findings and mental RFC determination were identical to those made by Dr. Montgomery at the initial level. Id. Likewise, he opined that Plaintiff remained capable of performing simple, routine work tasks. (R. 91).

2.   **Plaintiff's Treating Providers**

a.   **Stephanie J. Eppinger, Ph.D.**

On April 15, 2022, Dr. Eppinger completed a medical evaluation report, which is a checkbox form listing certain questions about Plaintiff's work capabilities.   (R. 2043-44).   On the form, she explained that Plaintiff

> has been most impaired by his difficulty
> tolerating others.  He has anger outbursts
> that place his and other's health in danger.
> This has undermined his ability to work as he
> has found co-workers intolerable and has left
> several positions of employment over the past
> 4 years.   He has had few supportive
> relationships and those that he has [have]
> been characterized by estrangements due to his
> difficulty tolerating others.

(R. 2043).  She described his prognosis as "fair to poor." Id.

Additionally,  Dr.  Eppinger  opined  that,  because  of Plaintiff's condition, he had "mild" limitations[5] in the following areas:  the  ability  to  understand  and  remember  detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule,  maintain  regular  attendance,  and  be  punctual  within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms

---

[5] The medical evaluation report allowed the physician to indicate the level of impairment for each listed activity, with the following checkbox options: none, mild, moderate, marked, and extreme.  (R. 2043-44).

and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (R. 2043-44).

Dr. Eppinger also indicated that Plaintiff had "moderate" limitations in his ability to interact appropriately with the general public and his ability to accept instructions or respond appropriately to criticism from supervisors.  (R. 2044).  Finally, she concluded that Plaintiff had "marked" limitations[6] in his ability to work in coordination with or proximity to others without being distracted by them; his ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and his ability to respond appropriately to customary stresses in a work setting.  (R. 2043-44).

C.   **Testimony Before the ALJ**

At the hearing on July 25, 2022, the ALJ heard testimony from Plaintiff and impartial VE, Mary Beth Kopar.  (R. 37-70).

1.   **Plaintiff's Testimony**

On direct questioning by the ALJ, Plaintiff testified that he is single, has no children, and lives alone.  (R. 44-45).  He

---

[6] The checkbox form defined "markedly limited" to mean that the "[p]atient has serious limitation in this area but function is not completely precluded.  (R. 2043).  By contrast, the form defined "extreme limitation" to mean a "[d]egree of limitation that is incompatible with the ability to do any gainful activity."  Id.

described a largely self-sufficient lifestyle in which he does his own laundry, cleans as necessary, and watches television. (R. 56-59). He said he makes simple meals in the microwave, but cannot cook because he forgets putting food in the oven. (R. 56-57, 62). He also claimed that he had been writing a fantasy book "on and off" for five years and was writing another book at the time of the hearing. (R. 52-53, 59).

Plaintiff testified that he has a driver's license, but that his car has been repossessed. (R. 45). Although he can borrow a car from his parents when needed, id., Plaintiff explained that he does not drive often because he is easily angered by other drivers, (R. 51, 63). Instead, he usually stays home, but will occasionally go to the store when he runs out of drinks or other small items. (R. 45, 63-64). His mother drives him to the grocery store once a month to buy groceries in bulk. (R. 64). Sometimes, his mother drives him to restaurants or cooks for him. (R. 57).

Regarding his work history, Plaintiff testified that he was in the military and worked as a cable installer. (R. 46-47, 52). This position required him to move heavy cable equipment that could only be lifted by two people. (R. 47-48). He said he left this job with the military upon discovering that he had a heart condition, and because of his depression and anxiety. (R. 48, 65). After his military service, he worked as an insulation installer on Navy ships, a toll collector, and a delivery driver

for Uber Eats.   (R. 48-51).   Plaintiff also said that he was previously in school for radiology, but did not finish his program and was no longer in school at the time of the hearing.   (R. 45). Plaintiff explained that he stopped pursuing his radiology degree because his grades were getting progressively worse each semester, and that he received one D and two Fs in the last three classes he completed.   (R. 45-46).

As to his medical history, Plaintiff testified that he has daily problems with focus and concentration.   (R. 61-63).   He attributed his declining performance in school to being easily distracted, (R. 45-46), and explained that he is easily bothered by noise, (R. 43-44, 62).   In fact, Plaintiff said he has changed apartments several times after becoming frustrated with his neighbors' noise levels.   (R. 43-44, 62).   He also disclosed that his irritation and impatience when driving had reached a point where "it was getting dangerous," and that "people were pulling weapons out on [him] because [he] would just get so upset."   (R. 63).   He said he has a few friends, but generally does not trust people and often falls out with those around him.   (R. 60).

Plaintiff also testified that he experiences headaches approximately every other day, which are triggered by light or stress.   (R. 54-55).   He reported anxiety as well, particularly in crowded places, when driving, or when he feels people are staring at him.   (R. 55).   Consequently, he prefers to minimize his time

in stores because he worries something bad will happen. (R. 56). Plaintiff said he also struggles with sleep. (R. 60). He reported taking medications to help with these various conditions, with inconsistent improvement. (R. 54-55, 60-61).

Additionally, at the hearing, Plaintiff was wearing a brace on his right wrist, which he said was to help with arm pain. (R. 53). He testified that he wears the brace at all times, except when sleeping, and had been wearing it for two or three years. Id. He noted that, when he was in school, the brace on his arm made it difficult to efficiently write or type notes. (R. 45-46, 53-54).

### 2. Testimony from VE Kopar

Mary Beth Kopar is an impartial VE. (R. 65-66). At the hearing, the ALJ's hypothetical posited a person with the same age and work experience as Plaintiff who was capable of "light work" with the following limitations:

> could frequently handle, finger and feel with his dominant arm, could never climb ladders, ropes and scaffolds, occasionally be exposed to unprotected heights, moving mechanical parts, humidity, dust, odors, fumes and pulmonary irritants, extreme cold and extreme heat and is also limited to simple, routine, repetitive tasks not at a production pace rate meaning no assembly line work. There would be no quotas. The work would be performed at a consistent pace throughout the day. And, only occasional contact with the public.

(R. 67-68).  The VE testified that the following "light" jobs would be available to such a person:  sorter (DOT 222.687-014) with 300,000 jobs nationally; marker (DOT 209.587-034) with 100,000 jobs nationally; and photocopy operator (DOT 207.685-014) with 40,000 jobs nationally.  (R. 68).

In response to the ALJ's follow-up questions, the VE testified that the listed jobs would still be available if the hypothetical individual was also limited to occasional contact with supervisors and coworkers and rare contact with the public, with "rare" defined as "five percent of the time or less."  Id.  The VE also testified that the listed jobs would tolerate an employee being off task "up to 15%" of the time and being absent "up to one day per month."  (R. 69).

### III. STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than

a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

Plaintiff's brief identifies one error in the ALJ's decision that he claims warrant remand. He argues that the ALJ "failed to properly evaluate the opinion evidence" from Stephanie J. Eppinger, Ph.D., Plaintiff's treating psychotherapist. Pl.'s Mem. (ECF No. 17, at 5-11). The Commissioner argues that the ALJ

"reasonably found Dr. Eppinger's checkbox form only somewhat persuasive." Def.'s Br. (ECF No. 19, at 23). As explained below, this Report finds that the ALJ adequately evaluated the medical opinion evidence in the record. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

## A.   Framework for SSA Disability Evaluation

A person may file for and receive disability insurance benefits under the Social Security Act if he or she meets the insured status requirements of 42 U.S.C. § 423(c)(1), is under the retirement age as defined in § 416 of the Act, and is under a disability as defined in § 423(d). As relevant here, the Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); accord 20 C.F.R. § 404.1505(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 404.1520(a)(4).

23

Specifically, the regulations direct the ALJ to answer the following five questions:

1.   Is the individual involved in substantial gainful activity?

2.   Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.   Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.   Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.   Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled.   An affirmative answer to questions three or five establishes disability.   The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy. See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(3); 404.1520b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age." Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)). Ultimate responsibility for making factual findings and weighing the evidence rests with the ALJ. Hays, 907 F.2d at 1456 (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B. The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from his alleged disability onset date until the hearing date. (R. 19-20). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: cardiomyopathy; obesity; ulnar nerve disorder of the right upper extremity; depression; anxiety; and post-traumatic stress disorder. (R. 20). At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments. (R. 20–22). The ALJ then developed a finding regarding Plaintiff's RFC. (R. 22). She determined

Plaintiff was able to perform light work with following limitations:

> the claimant can frequently handle, finger, and feel with the dominant right arm. The claimant can never climb ladders, ropes, and scaffolds. The claimant can occasionally work around unprotected heights, moving mechanical parts, humidity, dusts, odors, fumes, pulmonary irritants, extreme cold, and extreme heat. The claimant could perform simple, routine, and repetitive tasks that require no production rate pace work (This is defined as work that requires assembly line pace work or production quotas.) The work would be performed at a consistent pace throughout the day. He can have rare social contact (defined as less than five percent of the day) with the public and occasionally contact with coworkers and the public.[7]

Id. At step four, the ALJ concluded that Plaintiff could not perform past relevant work. (R. 30). At step five, the ALJ found work in the national economy Plaintiff could perform, and therefore found that he was not disabled. (R. 30-31).

---

[7] Plaintiff notes that the final sentence of the RFC "is internally inconsistent as it provides for both occasional and rare social contact with the public," but does not argue that the inconsistency amounts to legal error. Pl.'s Mem. (ECF No. 17, at 6). As the Commissioner's brief explains, the inconsistency "appears to be a scrivener's error" given that, at the hearing, the ALJ asked the VE to imagine a hypothetical individual capable of rare "occasional contact with supervisors and co-workers" and rare contact with the public. Def.'s Br. (ECF No. 19, at 19 n.3). Plaintiff has not argued to the contrary and this is the court's understanding as well.

C.   **The ALJ's Evaluation of the Opinion Evidence in the Record Complies with the Controlling Regulations and is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ erred by improperly evaluating Dr. Eppinger's medical opinion. Pl.'s Mem. (ECF No. 17, at 5-11.) The Commissioner argues that the ALJ's evaluation of the opinion evidence in the record is proper and supported by substantial evidence. Def.'s Br. (ECF No. 19, at 22-27). Because the ALJ's evaluation of Dr. Eppinger's opinion was appropriate and consistent with SSA regulations, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

1.   **The ALJ properly evaluated the medical opinion from Dr. Eppinger.**

Under the applicable regulations,[8] the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates

---

[8] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff protectively filed his claims on March 9, 2021, (R. 71, 241-44), the new rules apply.

whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

When evaluating a medical opinion under these rules, the ALJ cannot "cherrypick[] facts that support a finding of nondisability while ignoring evidence that points to a disability finding." Bilotta v. Saul, 850 F. App'x 162, 169 (4th Cir. 2021) (quoting Lewis, 858 F.3d at 869); see also Apr. R.D. v. Saul, No. 2:20-cv-210, 2021 WL 3260072, at *9 (E.D. Va. June 29, 2021) (recommending remand because the ALJ "selectively cherry-picked unrepresentative evidence"), R. & R. adopted by 2021 WL 3215093 (E.D. Va. July 29, 2021). Cherry-picking occurs when an ALJ focuses on "a single treatment note that purportedly undermines [the source's] overall assessment of [the plaintiff's] functional limitations . . . ." Hudson v. Colvin, No. 12-cv-269, 2013 WL 6839672, at *8 (E.D.N.C. Dec. 23, 2013) (quoting Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011)).

Here, when explaining her RFC determination, the ALJ first stated that she "considered the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 404.1520c and 416.920c." (R. 22). Then, assessing Dr. Eppinger's opinion specifically, the ALJ found the

opinion to be only "somewhat persuasive." (R. 29). The ALJ reasoned that, "[a]s to the supportability of this opinion, Dr. Eppinger provided little rationale for her opinion. In addition, Dr. Eppinger's treatment records showed that the claimant was generally stable when he attended mental health treatment at the VA." Id.

Nonetheless, the ALJ determined that, "with regard to the consistency of the opinion, Dr. Eppinger's opinion is somewhat consistent with the record." Id. Although the ALJ ultimately "found that the claimant had marked social limitations and limited him to rare social interaction," she noted that Dr. Eppinger's extreme findings regarding Plaintiff's ability to socialize were undermined by evidence in the record showing "that despite having anger and emotional regulation deficits, the claimant could interact with family and a few friends." Id. She also noted that "[h]e was never arrested for his alleged incidents of road rage, and he was euthymic and displayed normal behavior in his examinations." Id.

However, the ALJ agreed that the record supported Dr. Eppinger's conclusion "that the claimant would have only moderate limitations in maintaining concentrating, persistence, and pace and mild limitations in understanding and remembering information and in adapting and managing himself." Id. Specifically, the ALJ noted that the evidence in the record

shows that the claimant [was] stable with treatment.  The claimant had intact thought processes, normal behavior, and intact cognitive functioning.  He denied suicidal or homicidal ideation.  He was attending school online and worked as an Uber driver after the alleged onset date.  The claimant's examinations also showed that he was pleasant and cooperative.  The claimant was euthymic, and he had intact insight and judgment.  The claimant had normal cognitive functioning, and he displayed normal speech.  The claimant was consistently alert and oriented, could attend online school, could focus on writing a book, and had intact memory and thought processes.

(R. 29-30).

Plaintiff insists that this reasoning is inadequate because "the ALJ failed to adequately explain how she considered the supportability factor."  Pl.'s Mem. (ECF No. 17, at 8).  In Plaintiff's view, the ALJ's supportability analysis is "cursory" and supported by only a general citation to Exhibit 2F, rather than specific evidence or pages in the record.  Id. at 7.

He also contends that the ALJ's explanation is incorrect, not supported by the record, and "belittle[s] the severity of the treating provider's findings."  Id. at 9.  In support of that position, Plaintiff points to Dr. Eppinger's treatment notes documenting Plaintiff's reports of feeling depressed, irritable, and occasionally suicidal.  Id. at 9-10.  He also highlights his inpatient hospitalization on February 28, 2020, as well as his PTSD and depression diagnoses.  Id.  Plaintiff argues the ALJ

ignored this evidence, choosing instead to cherry-pick favorable facts from the record. Id. at 10.

Finally, Plaintiff also contends that the ALJ failed to consider that mental health symptoms "wax and wane" over the course of treatment, and that Plaintiff's supposed stability is not necessarily indicative of improvement or inconsistent with Dr. Eppinger's findings. Id. at 10-11.

On the other hand, the Commissioner argues that the ALJ's rationale adequately addressed the supportability factors. Def.'s Br. (ECF No. 19, at 23-25). The Commissioner points to the ALJ's discussion of Dr. Eppinger and Semones' treatment notes between 2018 and 2021 showing normal mental examination findings and adequate management of Plaintiff's conditions with treatment. Id. at 23-24. She also notes that "the ALJ expressly discussed the extent of Plaintiff's daily activities," including working, attending school, and using self-help techniques to manage stress. Id. In short, in the Commissioner's view, "the ALJ's decision discussed the record evidence (including Exhibit 2F) in narrative fashion and at substantial length" before concluding that the evidence supported her RFC assessment. Id. at 24.

The Commissioner also disputes Plaintiff's contention that the ALJ cherry-picked the record, arguing that the specific evidence cited by the ALJ is consistent with the weight of evidence contained in the record. Id. at 25-26. As to Plaintiff's

31

contentions that the ALJ failed to consider the fluctuating nature
of mental illness and incorrectly assessed Plaintiff's stability,
she argues that these arguments are no more than a request for
this court to "conduct a de novo review, reweigh the evidence and
resolve any evidentiary conflicts in [Plaintiff's] favor." Id. at
26-27.  The Commissioner believes such a review would be improper
here, where "the ALJ repeatedly pointed to a longitudinal record
showing that Plaintiff's mental status examinations were largely
normal" and that his "cycle of symptoms [were] caused by his
sporadic compliance with medication and therapy and by external
stressors such as school, finances, death, and relationships."
Id.  On all of these issues, I agree with the Commissioner.

The ALJ began her discussion of Dr. Eppinger's opinion by
noting Dr. Eppinger's conclusion that Plaintiff "had difficulty
managing his anger" and "had few supportive relationships."  (R.
29).   The ALJ then explained the limitations found in Dr.
Eppinger's opinion:

> He had none to mil[d] limitations in
> understanding and memory as well as in
> sustaining concentration, persistence, and
> pace.  He had marked limitations in working
> with or in proximity to others without being
> distracted by them, in getting along with
> coworkers or peers without distracting them or
> exhibiting behavioral extremes.  He had marked
> limitations in responding appropriately to
> customary stresses in a work setting.  He had
> moderate limitations in interacting
> appropriately with the general public and
> accepting instructions and responding

32

> appropriately to criticism from supervisors.
> He had only mild limitations in completing a
> workweek or workday without interruptions from
> his mental health impairments and in
> maintaining socially appropriate behavior and
> basic standards of neatness and cleanliness.

Id. Finally, the ALJ mentioned that Dr. Eppinger had been treating
Plaintiff since March 2018 and opined that Plaintiff's prognosis
was fair to poor.  Id.

The ALJ then addressed the supportability and consistency of
the opinion as required by 20 C.F.R. § 404.1520c(b)(2), ultimately
concluding that the opinion was somewhat persuasive because it was
not supported by any written explanation or by Dr. Eppinger's
treatment notes, but was only somewhat consistent with other
evidence in the record.  (R. 29-30).  Regarding supportability,
the ALJ referenced Dr. Eppinger's treatment notes indicating that
Plaintiff was alert and oriented, speaking normally, thinking
linearly, denying suicidal ideations, and otherwise functioning
normally.  (R. 29).  Dr. Eppinger made these or similarly
unremarkable findings at nearly every appointment she had with
Plaintiff.  See (R. 398-400, 437-38, 538-39, 553, 608, 618-19,
635-36, 644-46, 658-59, 663, 668-70, 1513, 1525, 1535-36, 1585,
1596, 1612, 1681-82, 1723).  Although the ALJ only referenced these
findings with a general citation to Exhibit 2F, she had explored
and considered them in great detail just prior to her assessment
of Dr. Eppinger's opinion and in the same general discussion

regarding the basis for her RFC determination.  The ALJ's narrative discussion of this evidence demonstrates that she sufficiently considered the supportability of Dr. Eppinger's opinion as required by the SSA regulations.

Plaintiff points to numerous other pieces of evidence in Dr. Eppinger's treatment notes that are supportive of and consistent with the conclusions in her opinion, arguing that the ALJ cherry-picked the record for favorable evidence.  Pl.'s Mem. (ECF No. 17, at 9-10).  However, the facts the ALJ used to discount Dr. Eppinger's medical opinion were representative of the record as a whole.  See Arakas v. Comm'r, SSA, 983 F.3d 83, 99, 102 (4th Cir. 2020) (finding that the ALJ errs when misstating or mischaracterizing facts).  The ALJ thoroughly detailed the medical record in support of her RFC, highlighting numerous pieces of evidence contradicting and supporting the conclusions in Dr. Eppinger's opinion.  (R. 25-37).

For example, the ALJ highlighted that in February 2019, Plaintiff "was working the night shift at Amazon, and he was attending school."  (R. 25).  She noted that in December 2019, Plaintiff "reported that he had been managing his stress by working out and distracting himself," and that he "planned to spend Christmas with his family."  Id.  She also pointed out that, in September 2020, Plaintiff reported being able to "walk away" when upset.  (R. 26).  She highlighted consistently normal mental

34

examination findings from Plaintiff's appointment's with Semones, and his ongoing ability to take online classes and work despite his impairments. (R. 25-27). All of these facts — and others cited by the ALJ — corroborate the unremarkable mental examination findings in Dr. Eppinger's treatment notes that the ALJ used to discount and credit specific limitations reported in Dr. Eppinger's opinion. As such, the ALJ did not cherry-pick the record, and her conclusions regarding the supportability, consistency, and overall persuasiveness of Dr. Eppinger's opinion are supported by substantial evidence.

Additionally, reversal is not warranted simply because the record contains evidence which could support a conclusion opposite from the one reached by the ALJ. The court must defer to the ALJ's findings if those findings are supported by substantial evidence. Perales, 402 U.S. at 390; see also Lewis, 858 F.3d at 865. This appeal is not an opportunity to relitigate the case. If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the ALJ. Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)). Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding. Thus, there was no error in the ALJ's evaluation of Dr. Eppinger's

opinion and her decision to find the opinion only somewhat persuasive is supported by substantial evidence.

### V.  RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court DENY Plaintiff's Motion for Summary Judgment, (ECF No. 15), and AFFIRM the final decision of the Commissioner.

### VI.  REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.  Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.  A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

36

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court based on such findings and recommendations.   Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).


                                        _____/s/_____
                                        Douglas E. Miller
                                        United States Magistrate Judge
                        _____

                              DOUGLAS E. MILLER
                              UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
July 25, 2023

37